IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHERYL BROOKE                           :

                                              :

   v.                               :   Civil Action No. DKC 11-3463
                                                    Criminal No. DKC 08-289
                                            :

UNITED STATES OF AMERICA

                                              :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case is the motion of Petitioner Cheryl Brooke ("Ms. Brooke" or "Petitioner") to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255. (ECF No. 253).[1] The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion will be denied.

**I.  Background**

On April 13, 2009, Cheryl Brooke pled guilty pursuant to a plea agreement to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of bankruptcy fraud, in violation of 18 U.S.C. § 157. (ECF No. 258-1). As part of her plea agreement, Petitioner admitted to the following facts concerning her involvement in an equity-fraud scheme. (*Id.* at 10). Between 2005 and 2008, Ms. Brooke and co-

---

[1] All citations to electronic court filings refer to the docket in the criminal case.

conspirators Michael K. Lewis, Earnest Lewis and Winston Thomas devised a scheme "to defraud homeowners and lenders, and to obtain money and property from the homeowners and lenders, by means of materially false and fraudulent pretenses, representations, and promises." (*Id.* at 10-11). The goal of the conspiracy was to steal the homeowners' equity out of their property by inducing the homeowners to sell their property to Ernest Lewis and converting sale proceeds to the use of the conspirators. (*Id.* at 11). Petitioner and her co-conspirators fraudulently represented to their clients that they would be able to keep their homes through a "lease/buy-back" program. (*Id.*). The homeowners would be required to sign over the equity in their homes to one of Petitioner's co-conspirators, under the belief that they would be able to buy back their homes once they were in a financial position to do so. Once the homeowners had signed over the equity in their homes, they would pay inflated "rent" and fees, which were directly debited from the victims' bank accounts to an account belonging to Petitioner's company, "In the House Technologies" ("IHT").

On September 23, 2009, Petitioner was sentenced to 46 months imprisonment followed by three years of supervised release. (ECF Nos. 258-2 & 174).[2] The court deferred decision on the restitution amount pending an evidentiary hearing. The

---

[2] Petitioner currently is on supervised release.

2

restitution hearing occurred on November 19, 2009, before Magistrate Judge Jillyn K. Schulze. After the hearing, the Government filed a supplemental memorandum in aid of restitution. (ECF No. 258-4). Defense counsel filed a response to the supplemental memorandum. (ECF No. 258-5). On March 31, 2010, the court issued an amended judgment with a final restitution amount of $660,986. (ECF No. 258-6).

Petitioner filed a timely notice of appeal, and on September 30, 2010, the United States Court of Appeals for the Fourth Circuit affirmed Ms. Brooke's sentence. *United States v. Brooke*, 395 F.App'x 944 (4th Cir. 2010). Petitioner filed the instant habeas petition on December 1, 2011. (ECF No. 253). The Government opposes the motion. (ECF No. 258).

**II. Standard of Review**

28 U.S.C. § 2255 requires a petitioner asserting constitutional error to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law." If the Section 2255 motion, along with the files and records of the case, conclusively shows that petitioner is not entitled to relief, a hearing on the motion is unnecessary and the claims raised in the motion may be summarily denied. *See* 28 U.S.C. § 2255(b).

**III. Analysis**

Petitioner raises three arguments in her habeas petition. Petitioner identifies two purported errors by her attorney Joseph Gigliotti. First, Petitioner contends that her attorney failed to argue for a minor role two-point reduction at sentencing. Second, she asserts that Mr. Gigliotti failed to consult with her regarding the Government's amended restitution amounts. Finally, Petitioner argues that the court erred in applying a two-level vulnerable victim sentencing enhancement.

**A. Ineffective Assistance of Counsel**

**1. Standard of Review**

Claims of ineffective assistance of counsel are governed by the well-settled standard adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim under *Strickland*, the petitioner must show both that her attorney's performance fell below an objective standard of reasonableness and that she suffered actual prejudice. *See Strickland*, 466 U.S. at 688. To demonstrate actual prejudice, Petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In the *Strickland* analysis, there exists a strong presumption that counsel's conduct falls within a wide range of

reasonably professional conduct, and courts must be highly deferential in scrutinizing counsel's performance. *Strickland*, 466 U.S. at 688–89; *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991). Courts must assess the reasonableness of attorney conduct "as of the time their actions occurred, not the conduct's consequences after the fact." *Frye v. Lee*, 235 F.3d 897, 906 (4th Cir. 2000). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice could have resulted from some performance deficiency. *See id.* at 697.

    **2.  Minor Role Adjustment**

Petitioner's plea agreement provided that she could argue that a 2-level downward adjustment applied pursuant to 3B1.2(b) because she was a minor participant, but that the Government would oppose the adjustment. The Pre-Sentence Report did not recommend applying the minor role adjustment, and counsel notified the probation officer that Ms. Brooke would be asking the court to apply it. At sentencing, however, counsel withdrew

the objection to the guideline calculation, indicating that the argument was better suited to a 3553(a) presentation.

Petitioner argues that her attorney "never addressed let alone argued Ms. Brooke's minor role in the offense." (ECF No. 253-1, at 2). She states that one of the reasons she signed the plea agreement was because she believed her attorney would argue that she played a minor role in the conspiracy. (*Id.*).

Pursuant to U.S.S.G. § 3B1.2(b), a defendant's offense level may be decreased by two levels "if a defendant was a minor participant in any criminal activity." The Fourth Circuit explained in *United States v. Pratt*, 239 F.3d 640, 646 (4th Cir. 2001):

> Our precedent makes clear that "mitigating role adjustments apply only when there has been group conduct and a particular defendant is less culpable than other members of the group to such a degree that a distinction should be made at sentencing between him and the other participants." *United States v. Gordon*, 895 F.2d 932, 935 (4th Cir. 1990). However, whether a role in the offense adjustment is warranted "is to be determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction." *United States v. Palinkas*, 938 F.2d 456, 460 (4th Cir. 1991) (internal quotation marks omitted). "The critical inquiry is thus not just whether the defendant has done fewer 'bad acts' than his co-defendants, but whether

> the defendant's conduct is material or essential to committing the offense." *Id.*

Petitioner has not established that Mr. Gigliotti's failure to argue for a minor participant reduction fell below the prevailing professional standards. Mr. Gigliotti's decision not to seek a "minor participant" reduction was a strategic choice made during the course of the representation. The court must be highly deferential when evaluating counsel's strategic choices. *See Strickland*, 466 U.S. at 689.

Mr. Gigliotti's decision not to argue minor role participant at sentencing fell well within the bounds of reasonableness, as Section 3B1.2(b) was inapplicable to Petitioner. As part of her plea agreement, Petitioner admitted facts that demonstrated her integral role in the conspiracy. During the Rule 11 hearing, the Government read facts that established her integral role, and Petitioner agreed that such facts were true. (ECF No. 258-7, at 25). Specifically, Ms. Brooke and her coconspirators specifically targeted homeowners who owned and had equity in their homes but were facing foreclosure because of their inability to make monthly mortgage payment. (*Id.* at 22). Ms. Brooke filed motions in Bankruptcy Court in an effort to execute and conceal the scheme to defraud and facilitated payments to and from the victims as part of the equity-stripping scheme, including depositing victim checks in

7

her company, IHT.  (*Id.* at 24).  "During the life of the conspiracy, [Ms.] Brooke had signatory authority over the IHT account, caused checks to be issued to the homeowners and allowed the IHT account to be used to deposit the proceeds of the equity-stripping scheme."  (*Id.*).

At sentencing, Mr. Gigliotti indicated that he considered arguing for a minor role reduction, but ultimately decided against doing so based on his professional judgment and after evaluating various materials and factual circumstances of the case.  (ECF No. 258-2, at 19-20).  At sentencing, Mr. Gigliotti stated that he reviewed the Government's sentencing materials, engaged in discussions with the Government, and informed Government counsel that "although [he] had drafted a memorandum, [his] decision not to file one was because [he thought] that we're pretty clear, and so Ms. Brooke is also clear, that [] she pled guilty to this conspiracy."  (*Id.* at 19).  He argued at sentencing, however, that "although [Ms. Brooke] wasn't technically under the guidelines a minor player," Mr. Lewis "was the one that made things happen and used Ms. Brooke's . . . ability to put forth these bankruptcy filings, to keep this engine of criminal activity going."  (*Id.* at 20).

Based on the foregoing, Mr. Gigliotti's decision not to argue for a minor role reduction did not fall below an objective standard of reasonableness.  Moreover, Petitioner cannot show

that her sentence would have been any different had Mr. Gigliotti argued for a minor role adjustment. As the Government argues, at sentencing the undersigned stated that "Ms. Brooke's participation was integral to the continuation, success of the scheme. Some of the people who have spoken today have indicated how her presence and participation was extremely important in their victimization." (*Id.* at 28). Therefore, there is no basis on which to find Mr. Gigliotti deficient for failing to request a Section 3B1.2(b) reduction.

### 3. Restitution

Next, Petitioner argues that Mr. Gigliotti failed to review with her the amended restitution figures before concurring with the Government's amended restitution calculations. (ECF No. 253-1, at 4). Specifically, Petitioner objects to the inclusion of certain down payments made by Ernest Lewis in calculating the restitution figures. She states:

> The government deducted all of the mortgage payments but not the down payments. If the government had deducted all of the down payments[,] this would put Ms. Brooke[] into another sentencing category[.] [H]er actual and intended loss would be under $400,000 which s[h]ould give Ms. Brooke[] a 2 [point] downward adjustment.

(*Id.*).

Petitioner is mixing two different sentencing considerations. Loss amount for guideline purposes was determined at the initial sentencing hearing and she had agreed

9

in her plea agreement to a 14 level upward adjustment because the loss amount was more than $400,000 but less than $1,000,000. Restitution is a separate (but sometimes related) issue that was not resolved at the initial sentencing. Rather, the restitution for Ms. Brooke and her co-conspirators was referred to a magistrate judge. ECF No. 177.

Judge Schulze held a restitution hearing on November 19, 2009. Among other things, Ms. Brooke argued that Ernest Lewis's down payments to purchase the homes should be deducted from the restitution amount owed to the victims. (ECF No. 258-3, at 64-65). She stated that the victims did not lose the down payment amounts because "Ernest Lewis paid it and then he was reimbursed." (*Id.* at 65). At the conclusion of the hearing, the Government agreed to consider Petitioner's objections and submit amended restitution figures to the court. On December 21, 2009, the Government filed a memorandum with amended restitution amounts and addressed the objections from the restitution hearing. (ECF No. 258-4). As to the argument regarding the down payment deduction, however, the Government stated:

> As was demonstrated at the hearing via the testimony of Postal Inspector Epps and the exhibits introduced, while Defendant Lewis did make the down payments using monies from his personal account, he was already reimbursed for these expenses out of the equity monies stolen from the homeowners. []

>       Thus, the government did not make any further deductions from the restitution amounts owed by the defendants to the victims.

(*Id.* at 6). Defense counsel subsequently filed a response to the Government's supplemental memorandum, stating that "Cheryl Brooke concurs with the amended restitution figures set forth in the Government's attachment 1 and the Government's attachment 2 to its Supplemental Memorandum in Aid of Restitution." (ECF No. 258-5, at 1).  In the instant petition, however, Ms. Brooke asserts that her *attorney* concurred, but she did not actually review the amended restitution figures and "[s]he would have never agreed to the amended figures because the amounts still included the down payments." (ECF No. 253-1, at 4).

The Government submits an affidavit from Mr. Gigliotti, in which he avers that "on January 9, 2010 and January 21, 2010, [he] met with Ms. Brooke [to] review[] the amended figures. We further discussed the fact that Earnest Lewis' down payments were reimbursed to him from the equity taken from the victim homeowners. Ms. Brooke then concurred with the amended figures for restitution." (ECF No. 258-8 ¶ 3). Although the Government did not agree that the restitution amount should be reduced for down payments made by Mr. Lewis, deductions were made by the Government for rent payments. (*See* ECF No. 258-4, at 5). Regardless of whether Ms. Brooke actually concurred with the

amended restitution figures, however, she cannot show that she was prejudiced by any purported failure by her attorney to consult with her.  Indeed, the Fourth Circuit concluded that "the district court's restitution order was adequately supported by Brooke's testimony and the Government's evidence regarding the conspiracy victims' losses." *Brooke*, 395 F.App'x 944, 2010 WL 3868378, at *2 n.2.  Accordingly, she has not demonstrated ineffective assistance of counsel on this basis either.

### B. Vulnerable Victim Sentencing Enhancement

Petitioner contends that the court erred in applying the two-level vulnerable victim sentencing enhancement under U.S.S.G. § 3A1.1(b) because the victims of the financial scheme were not "vulnerable." (ECF No. 253-1, at 5-6).  The Guidelines provide for a two-level enhancement when the defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).  A "vulnerable victim" is defined as "a victim of the offense of conviction and any conduct for which the defendant is accountable under [U.S.S.G.] § 1B1.3 (Relevant Conduct) . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1 cmt. n.2.

The Government argues that Petitioner waived this claim by failing to raise it on direct appeal.  In her habeas petition,

Petitioner indicates that she did raise it on appeal. (ECF No. 253, at 6). On appeal, her attorney filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), stating that after a review of the record, he found no meritorious issues for appeal. The *Anders* brief nonetheless raised as a possible issue for review whether the district court complied with Fed.R.Crim.P. 11 when it accepted Ms. Brooke's guilty plea; counsel further requested that the court conduct an independent review of the record to determine whether *any* justifiable issue or prejudice error was overlooked by counsel. Ms. Brooke filed a supplemental brief and moved for immediate release. Notably, the Fourth Circuit affirmed Petitioner's sentence, holding that:

> Brooke's presentence investigation report [] properly placed her in criminal history category I and attributed her with a total offense level of twenty-four yielding a Guidelines range of fifty-one to sixty-three months on her conspiracy to commit wire fraud conviction. The PSR also correctly noted that Brooke faced a sixty-month statutory maximum sentence for her bankruptcy fraud conviction. At sentencing, the district court granted the Government's U.S. Sentencing Guidelines Manual § 5K1.1 (2006) motion, appropriately heard counsel's argument regarding the weight that should be afforded the 18 U.S.C. § 3553(a) (2006) factors, allowed Brooke an opportunity to allocate, and thoroughly considered the Guidelines and the § 3553(a) factors before imposing Brooke's forty-six month sentence.

Regardless of any procedural improprieties in Petitioner's challenge to the vulnerable victim enhancement on collateral

13

review, this claim is meritless. When, as here, a defendant pleads guilty, the guilty plea serves as an admission of all "material facts alleged in the charge." *United States v. Willis*, 992 F.2d 489, 490 (4th Cir. 1993) (citing *United States v. Johnson*, 888 F.2d 1255, 1256 (8th Cir. 1989)). The guilty plea additionally serves as a waiver of "the right to contest the factual merits of the charges." *Id.* In her plea agreement, Petitioner specifically stipulated to a two-level upward adjustment because she knew that "the victim of the offense was a vulnerable victim." (ECF No. 258-1, at 4). At the Rule 11 hearing, the court confirmed this stipulation, and Petitioner did not object. (ECF No. 258-7, at 26).

Contrary to her previous admissions, Petitioner now argues that the victims were not vulnerable and that the two-level upward adjustment was erroneously applied. Petitioner may not distance herself from statements made under oath at a plea hearing, however. *See Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003) ("Absent clear and convincing evidence to the contrary, Walton is bound by the representations he made during the plea colloquy."). Petitioner contends that although the victims "generally had poor credit and many were in danger of losing their homes through foreclosure proceedings," their financial distress did not make them "vulnerable" to the conspiracy. (ECF No. 253-1, at 6). The Fourth Circuit has

14

held, however, that financial vulnerability falls within the purview of U.S.S.G. § 3A1.1(b). *See, e.g., United States v. Holmes*, 60 F.3d 1134, 1137 (4th Cir. 1995) (affirming a two-level enhancement under § 3A1.1(b) because persons with poor credit ratings unable to obtain mortgage loans were unusually vulnerable); *United States v. Fordham*, 400 F.App'x 758, 760 (4th Cir. 2010) (rejecting argument by defendant that although the victims were finally stressed, they were not vulnerable in the sense intended by Section 3A1.1(b)). Accordingly, the court did not err in applying the vulnerable victim enhancement.

### C. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. §§ 2254 or 2255, the court is required to issue or deny a certificate of appealability when it enters a final order adverse to the petitioner. A certificate of appealability is a "jurisdictional prerequisite" to an appeal "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where the court denies a petitioner's motion on its merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Upon review of the record, the court finds that Petitioner does not satisfy the above standard. Accordingly, the court will decline to issue a certificate of appealability on the issues which have been resolved against Petitioner.

**IV. Conclusion**

For the foregoing reasons, Petitioner's motion to vacate, set aside, or correct her sentence will be denied. A separate order will follow.

                                              /s/
                              DEBORAH K. CHASANOW
                              United States District Judge